IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No.  18 CR 357-1 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| ANDREW SANTILLI, ) | |
| ) | |

## MEMORANDUM OPINION & ORDER

Defendant Andrew Santilli has filed a counseled motion for compassionate early release (Doc. 130) under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(6).  Defendant seeks a reduction of his sentence to time served.  Defendant asserts that his chronic medical condition—a blood clotting disorder—coupled with the unsafe conditions at Federal Correctional Institution ("FCI") Milan, place him at a heighted risk of complications and long-term side effects from COVID-19. The government opposed the motion arguing, in effect, that defendant's conditions could be treated with medication and that defendant is likely to recidivate.  For the following reasons, defendant's motion is granted.

## BACKGROUND

On June 5, 2019, defendant pleaded guilty to one count possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  As detailed in the plea agreement, defendant's offense conduct involved the possession and sale of multiple firearms.  In 2017, defendant sold a Glock pistol to his drug supplier and started building a fully-automatic assault rifle for the same individual.  After law enforcement seized both firearms, defendant agreed to cooperate with law enforcement.  Defendant then proceeded to obtain and sell another firearm to

his codefendant in exchange for heroin. The court sentenced defendant to 44 months' imprisonment to be followed by three years of supervised release. Defendant is scheduled to be released on November 2, 2021. On July 28, 2020, defendant sent a letter to the court requesting the appointment of counsel to assist him in filing a motion for compassionate release. The court appointed counsel and the instant motion followed.

Defendant asserts that he suffers from a severe blood clotting disorder. While serving in the U.S. Marines in Iraq, defendant received a shoulder injury that required a series of corrective surgeries. As a result of those surgeries, defendant developed a blood clotting disorder that causes blood clots to form in his circulatory system without discernable cause. He is required to take prescription blood thinners daily. Defendant was on Xarelto before custody; he is now on Apixaban. Without the medication, defendant develops blood clots that, in the past, have resulted in deep vein thrombosis, pulmonary embolism, and compartment syndrome. In one particularly serious incident, a clot formed and cut off blood flow to defendant's right arm. He required emergency surgery to save his arm.

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), the court is permitted to reduce a defendant's prison sentence and impose a term of supervised release if, 1) the defendant has exhausted his administrative remedies, and 2) after consideration of the § 3553(a) factors, the court finds that an "extraordinary and compelling reason" warrants a reduction. The application notes to the United States Sentencing Commission Guidelines explain that extraordinary and compelling reasons exist based on certain medical conditions, age, or family circumstances, or some combination thereof. U.S.S.G. § 1B1.13. The Guidelines also require that any applicant for

2

compassionate release not be a "danger to the safety of any other person or to the community," as provided for in 18 U.S.C. § 3142(g). A defendant may move for compassionate release after thirty days have passed since the defendant sent a request to the warden of the facility at which he is housed seeking release. 18 U.S.C. § 3582(c)(1)(A).

## DISCUSSION

The parties agree that defendant's motion is properly before the court because more than thirty days have passed since defendant submitted his request to the warden of FCI Milan, and the warden has yet to respond. The remaining questions for the court are: (1) whether defendant has presented extraordinary and compelling reasons for a sentence reduction considering the § 3553(a) sentencing factors; and (2) whether the reduction will be consistent with applicable policy statements from the Sentencing Commission, particularly, whether defendant is a danger under the § 3142(g) factors.

**1. Extraordinary and Compelling Circumstances**

The court is cognizant of the risks associated with the current COVID-19 pandemic, and the fact that prisoners are particularly vulnerable to infection given the nature of their incarceration. Defendant argues that his preexisting medical condition places him at a heightened risk of complications should he contract COVID-19. As stated above, defendant has a history of pulmonary embolisms and compartment syndrome stemming from his blood clot disorder.

When first discovered, doctors and scientists thought COVID-19 was a respiratory virus like pneumonia.[1] As the pandemic continues and the scientific community has had more

---

[1] Taylor Ardrey, COVID-19 Autopsy Study Finds Blood Clots in 'Almost Every Organ', Pathologist Says, Business Insider July 13, 2020, available at https://www.sciencealert.com/covid-19-patient-autopsies-show-blood-clots-in-

3

opportunity to study the novel coronavirus, it is clear that COVID-19 is much more dangerous than a common respiratory virus. The virus often causes blood clots throughout the body, which can lead to more serious issues like strokes, kidney failure, heart inflammation, and immune-system complications.[2] More troubling is that the cause of the excessive clotting is not yet known.[3] "Data suggest that about one-in-three individuals critically ill with COVID-19 will develop a potentially life-threatening blood clot," and there "are reports that patients with milder illness, or even those who are asymptomatic or unaware that they are infected with the coronavirus, are developing dangerous blood clots."[4] Further, it is unclear whether this risk can be effectively mitigated with medication. Some scientists opine that treating patients with blood thinners such as aspirin may prevent dangerous clotting,[5] while others have emphasized that the cause of the clotting is still unknown, with one article stating, "blood thinners don't reliably prevent clotting in people with COVID-19."[6]

The court acknowledges that the CDC has not yet added people who suffer from clotting disorders to its list of people who are at a higher risk of severe complications from COVID-19. The CDC is aware, however, of the link between COVID-19 and blood clots, deep vein thrombosis, and pulmonary embolism, and is funding studies of the issue.[7] Despite this fact, at least two other courts have found "extraordinary and compelling circumstances" for a defendant

---

almost-every-organ-pathologist-says (last visited Oct. 29, 2020).
[2] Id.
[3] Cassandra Willyard, Coronavirus Blood Clot Mystery Intensifies, Nature May 8, 2020, available at https://www.nature.com/articles/d41586-020-01403-8 (last visited Oct. 29, 2020).
[4] National Blood Clot Alliance Press Release, CDC Grant Supports National Blood Clot Alliance COVID-19 Research, July 28, 2020, available at https://www.stoptheclot.org/news/grant-supports-covid-19-research/ (last visited Oct. 29, 2020).
[5] Doug Dollemore, COVID-19 Causes 'Hyperactivity' in Blood-Clotting Cells, June 29, 2020, available at https://healthcare.utah.edu/publicaffairs/news/2020/06/covid-blood-clots.php (last visited Oct. 29, 2020).
[6] Willyard, supra note 3.
[7] National Blood Clot Alliance Press Release, supra note 4.

suffering from, among other things, a blood clot disorder in the midst of the COVID-19 pandemic. See United States v. Hanson, -- F.Supp.3d --, 2020 WL 3605845 (D. Ore. July 2, 2020) (finding "extraordinary and compelling circumstances" where the defendant suffered from severe and chronic medical conditions that put him at an increased risk of complications associated with COVID-19, including blood clots and asthma); United States v. Smith, -- F.Supp.3d --, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (same, where defendant suffered from blood clots, asthma, a thyroid condition, and multiple myeloma).

Upon reviewing the various sources, the court finds that defendant has presented extraordinary and compelling reasons warranting his early release. Defendant's clotting condition is well-documented, and it carries the risk of severe complications should defendant contract COVID-19. Despite the government's arguments to the contrary, it appears that defendant's risk of severe clotting is not necessarily mitigated by blood thinners or other treatment. The court concludes that defendant is suffering from a chronic and serious medical condition which significantly increases his risk of severe complications from COVID-19. This risk is further exacerbated by defendant's incarceration. Defendant's facility has had 83 inmates test positive for COVID-19 since the beginning of the pandemic, including three deaths.[8] Defendant asserts that this must be an undercount, as the facility has a population of 1,308 inmates and only 430 have been tested since the start of the pandemic.[9] While the court understands that the facility is doing its best to limit exposure, the large number of positive cases coupled with defendant's health condition presents a serious cause for concern that defendant's

---

[8] https://www.bop.gov/coronavirus/ (last visited Oct. 29, 2020).
[9] Id.

clotting disorder puts him in grave danger should he contract COVID-19. Defendant has presented an "extraordinary and compelling reason" justifying his release.

**2. Section 3142(g) Factors**

Turning to the § 3142(g) factors, the court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, community safety, the types of sentences available, and all other obligations of sentencing including punishment, deterrence, and rehabilitation. These factors support defendant's request for compassionate release.

The court acknowledges that defendant's underlying offense was very serious. Defendant possessed and sold multiple firearms even after agreeing to cooperate with law enforcement. The seriousness of his conduct was a major factor in the forty-four month sentence originally imposed. However, the court did not intend that sentence to "include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic." Hanson, 2020 WL 3605845 at *3. In addition, most of defendant's prior criminal history involve low-level misdemeanor offenses stemming from drug use. Defendant participated in a drug treatment program at Gateway and has expressed a desire to continue treatment while on supervised release.

Defendant has further provided the court with a concrete release plan. Defendant's parents and brother live in rural Arkansas. Defendant has asked to be released to Arkansas so he can live with his brother away from the influences in the Chicagoland area that led him to drug use and crime. His brother owns a tree service company and has offered stable, fulltime employment to defendant.

Finally, and perhaps the most compelling argument in favor of release, defendant has served more than 60% of his sentence. Defendant's anticipated release date is November 2, 2021, and he would likely be released to a half-way house in the spring of 2021, which is only a few months away. He also faces three years of supervised release. See United States v. Early, 2020 WL 2112371, at *5 (N.D. Ill. May 4, 2020) (finding that the risk to the public "does not outweigh the risk to [defendant] from contracting the coronavirus while incarcerated," particularly where "the Probation Office and the Court will be monitoring him while on supervised the release and the Court will not hesitate to recommit him to prison should he again go astray.").

The court finds that defendant is not a danger to the community and has a low risk of recidivism. The court is concerned with defendant's prior drug use and notes that defendant's conditions of supervised release already require defendant to participate in a substance abuse program. The foregoing factors weigh in favor of release.

## CONCLUSION

For the reasons stated above, defendant's motion (Doc. 130) is granted. All previously imposed conditions of supervised release remain in place, with the following additional conditions of release:

- Defendant shall self-quarantine in a separate room for fourteen days after arriving at his brother's home, unless he tests negative for COVID-19 on release from FCI Milan or upon a test conducted in Arkansas.

- Defendant shall be subject to a period of home detention for six months after his release.

During this time, defendant must participate in a location monitoring program using technology approved by his probation officer.

**ENTER:** **November 3, 2020**

 Robert W. Gettleman
 United States District Judge